## EX PARTE D. H. MEYERS.

### No. 331.   *Decided April 21.*

1. **Evidence of Witness Taken Before Coroner's Inquest Admissible, When.**—Article 774, Code of Criminal Procedure, provides that the testimony of a witness taken at a coroner's inquest and reduced to writing, where defendant was present when it was taken and had the privilege afforded him of cross-examining the witness, is competent evidence against the defendant at any subsequent trial with reference to the killing, where the witness has died since giving said testimony.

2. **Coroner's Inquest—Examining Court—Compelling Presence of Defendant.**—Article 999, Code of Criminal Procedure, gives the party who is arrested and charged with the death of the deceased the right to be present, with his counsel, at the inquest and examine witnesses and introduce evidence. And a justice may compel the accused, when under arrest, to attend the inquest even though he protests against it. And the justice may hold an examining court while holding his inquest. Code Crim. Proc., art. 1011.

3. **Same.**—Where a party under arrest accused of causing the death of deceased has been compelled, against his protest, to appear at the inquest, and he was so present, though unwillingly, and represented by counsel, though he refused to cross-examine the witnesses when that privilege was tendered him, *Held*, under such circumstances, where one of the examined witnesses has since died, the testimony of such

witness is admissible as evidence against him at any subsequent trial with reference to the killing.

4. **Dying Declarations.**—*Dying declarations are not admissible in evidence, unless at the time of making them the declarant was conscious of approaching death, and believed there was no hope of recovery.*

5. **Habeas Corpus—Murder—Refusal of Bail.**—See facts stated on an application for bail under a writ of habeas corpus, upon which it is *Held*, that bail was properly refused to the relator, who was charged with murder.

APPEAL from McLennan County.   Tried below before Hon. L. W. GOODRICH, in chambers.

Appellant was committed to the custody of the sheriff of Milam County, by a justice of the peace, for the murder of one W. A. Binkley.   He applied for a writ of habeas corpus to the Hon. L. W. Goodrich, judge of the Nineteenth Judicial District, who granted the same. At the hearing under the writ relator was denied bail, and it is from that judgment this appeal is prosecuted.

The following is the evidence introduced on the hearing under the writ of habeas corpus:

"Be it remembered, that on a trial of the foregoing cause, the following testimony, taken at the examining trial held before D. F. English, justice of the peace, precinct number 1, Milam County, Texas, was offered in evidence by the State, the defendant in open court waiving the presence of said witnesses and agreeing that the said testimony should be used in evidence, subject only to such legal objections as he might make to the admissibility thereof.   And the defendant on said hearing offered no evidence except the following admission on the part of the State, to wit, that the defendant was born and raised at Cameron, in Milam County, Texas; that he was 25 years old; and up to the time of the killing of Binkley and Jones bore a good reputation in the community in which he lived as a peaceable, law-abiding, orderly, and quiet citizen, and had never been arrested in his life for anything; and said admission was received in evidence on said hearing."

The State offered in evidence the testimony of A. H. Jones, deceased, taken at the inquest over the dead body of W. A. Binkley, as follows: "I was over at what is called the Blue Goose last night.   I recognized Dave Meyers.   He was also there.   He shot W. A. Binkley and myself with a pistol.   Binkley was sitting in a rocking-chair.   Binkley was sitting on the left of the door as you enter the parlor.   I was sitting in a chair to his left.   Dave was standing about three steps in front of us.   Dave Meyers and a woman came into the parlor where we were sitting about five minutes before the shooting.   I was not in the room when he first came in, but when I went in the woman was trying to get Binkley to go up town.   Binkley said those fellows had drove his hack off and he was going to sit there till morning.   Mr. Meyers pulled his pistol and said, 'Now go.'   Binkley said he had no

weapons, and I think he pulled open his vest and showed that he had none.   Dave Meyers said to Binkley, 'Are you going?' and Binkley said, 'No,' and immediately Dave Meyers began shooting.   About the third shot the light went out.   I don't know which shot.   I was down on my haunches when I was shot.   Dave Meyers and I had drank some beer together and had been talking sociably with each other.   We had no quarrel.   After he had shot Binkley and the lights had gone out Dave Meyers lit a match, on his pants I think, and held it up, and he pointed his pistol at me, and I said, 'Mr. Meyers, don't shoot me.'   I was trying to get Binkley to leave, myself.   He made no reply, but began shooting me.   I got up and tried to find the door and couldn't, and then smashed in the window.   I pulled the sash in.   He shot me in the pit of the stomach once—the lower part of the stomach.   I had no arms and was making no demonstrations towards hurting Mr. Meyers.   He was sitting in a chair, as I have before stated."

[Applicant objected to the introduction of this testimony, because the same was given in the inquest held over the dead body of W. A. Binkley, and that defendant declined and refused to be present in person or by counsel at the taking of the testimony of said Jones, or to participate in any manner in said inquest proceedings; and it was shown to the court that said Meyers was in jail at Cameron, and when the justice of the peace who held said inquest got ready to take the testimony of A. H. Jones, he ordered the sheriff to take the said Meyers out to the house where Jones was.   The said defendant objected to being carried to the said house and refused to go, and was carried to the said house by the sheriff by force and required to remain present while the said testimony of the said Jones was given, and was offered an opportunity to cross-examine said Jones, but declined and refused to cross-examine said witness, and took no part whatever in said inquest proceedings, and was not present at any part thereof except during the time that said Jones testified, as before stated.   The testimony of said Jones was all the testimony given at said inquest. Applicant's objection was overruled and said testimony was admitted, to which ruling of the court applicant excepted at the time, and his bill of exceptions is accordingly allowed.]

Ed. F. English, justice of the peace, testified as follows as to the dying declarations of the deceased witness A. H. Jones: "I was called upon and went to see Alfred H. Jones on January 14, 1894, between 3 and 4 o'clock in the morning.   When I went in I found Dr. Greer there. When I first went to the bed where he was lying he spoke to me, calling me doctor.   I told him I was the justice of the peace, and had come to see him to ascertain how badly he was hurt, and to learn the particulars.   He seemed to be suffering very much, and I asked Dr. Greer if he was seriously hurt, and he said he thought so.   And I also asked him if there was any hope of his recovery; and he said he could

not tell; that he might get well. Jones spoke up and said, 'Doctor, don't try to fool me; I know I am bound to die.' Then he asked the doctor how long he could live, shot as he was, and the doctor repeated that he might possibly get well. And Jones insisted that he knew he was bound to die. In reference to the shooting he said: 'Binkley said to Emma Carlton that he was going to stay in the parlor or sitting room until Mayberry came back. Emma Carlton said she would rather he would leave. Binkley said they could go to bed and we would sit in the sitting room. Emma Carlton said then: 'Turn down the lamp and pull the door to, and wake her up when we went to leave.' They went to their room and I went out doors for a few minutes, and Emma Carlton and Dave Meyers came back into the room—the sitting room. I went back immediately, and they were trying to get Binkley to leave. I also argued with Binkley to go. He was sitting in a rocking-chair, rocking. Dave said, 'You go,' and Binkley said, 'I am going to stay till morning.' Dave drew his pistol and presented it, and said, 'Now go out,' and commenced to shoot Binkley. He shot him three times. The light went out. I heard Binkley fall. Dave Meyers then lit a match, on his pants I think, and then shot me through the lower part of the stomach. I was crouching down on my haunches when he shot me. I told him not to shoot me. I was trying to get Binkley to go, and he immediately began shooting me. The match went out, and I ran around the room trying to find the door. Finally I found the window and smashed it in and got out. There was no one present except myself, Meyers, Emma Carlton, and Binkley. Emma Carlton saw Meyers draw his pistol, and did nothing and said nothing to prevent it.' Sometime after this statement was made Jones said he had hopes that he might recover. This was said some five or ten minutes later.''

[To which testimony the applicant objected, because no sufficient predicate has been laid to admit the same as dying declarations. Said objection was overruled by the court, and the testimony admitted, to which ruling the applicant excepted and his bill of exceptions is accordingly allowed.]

Emma Carlton, a witness for the State, being duly sworn, testified as follows: "My name is Emma Carlton. On the 14th day of January, 1894, I was living in Cameron, in the house known as the Blue House. I was there on that night. I know Dave Meyers, and saw him there that night. He came there about 9 or 10 o'clock, and left sometime after 2 o'clock in the morning. I think he staid from 9 or 10 until 2 o'clock. I know a party that stated his name was Binkley. He came to my house between 11 and 12 o'clock. No trouble occurred to amount to anything. There was some shooting. Don't know who did the shooting. It occurred in the sitting room sometime after 2 o'clock. I was in the sitting room at the time. A man named Jones, Binkley, and Dave Meyers were in the room at the time of the shoot-

ing. Binkley was sitting to the left side of the door, about four feet from the door, with his back to the wall that the door was in. He was sitting in a rocking-chair, leaning far back in his chair. I never noticed the position of his feet particularly, but think he had his feet on a chair or box in front of him. He was tipping so far back that I think he must have had his feet on something. I never noticed the position of his hands, but think his elbows were on the arms of the chair. I could not say this was the position at the time of the shooting. I never looked at him at the time of the shooting, but just before. I don't know anything that occurred after the shooting. I was in the room about ten minutes before the shooting took place. I was in the northeast corner of the room, next to the stove, when the shooting took place in the corner to the right, across the room from the door. I do not know which way I was looking when the shooting took place. I was talking to Jones and Meyers was talking to Binkley. Binkley was on the opposite side of the room to me, on the same side the door was on. Meyers was on the same side of the room that I was, on the opposite side of the stove from me. I was standing nearly in one corner, and Meyers was near the opposite corner of the same wall. At the time of the shooting I was talking to Jones and Meyers was talking to Binkley. I did not see a pistol. Jones was about three feet from Binkley, facing me; not quite side to Meyers, more facing. At the time of the firing I believe Binkley was sitting down, as stated by me. He made a forward motion in his chair about a minute before the firing. He leaned about half-forward. Don't know that he did anything else, as I did not look at him any more. I mean that I did not notice him any more, as I was talking to Jones. In talking to and looking at Jones I would be looking nearly at Binkley. I did not see Binkley, at the time or just before the shooting, make any demonstration to do any violence to the defendant or any one else. I was not noticing him, but was still in conversation with Jones. Jones did not make any demonstration to do any violence to the defendant or any one else. I was looking at him at the time. Jones was about three feet to the left of Binkley as you go into the door. Binkley used insulting language, but I can't remember the words. I believe it was addressed to Meyers. Two or three minutes after this language I heard the report of the pistol. I don't know who fired the pistol. Don't know what portion of the room the sound came from. I don't know whether Meyers shot or not. Can't tell whether Jones fired or not. If he had presented a pistol I think I would have seen it, as the lamp was on the table near him. If Binkley had fired I think I would have seen it. I did not fire a pistol. Dave and I were trying to get Binkley and Jones to leave the house. About an hour before the shooting, Binkley said he was tired of seeing men display their six-shooters unless they were going to use them. This remark was to the

crowd in general; never noticed who he was looking at. Think he was looking at Meyers, but I could not swear it. There was a whole crowd there at that time. There were present Irb. Lyles, Mr. Mayberry, Charlie Coleman, Rube Johnson, and three others that I did not know. It was in the presence of these parties that the remark was made. I saw no one in the room at the time of the shooting except Binkley, Jones, and Meyers. When the pistol was fired the light went out. Can not tell how many shots were fired, but think three or four. I don't know how long it was between the first and last shots, but think they followed in succession, and think I could count ten or fifteen from the first to the last. I left the room about two minutes after the firing. Don't know what Binkley did after the firing. I heard something fall, but did not know what it was. I was so frightened I could not tell. I heard glass breaking about the time I left the room. Meyers left the room with me. Think Meyers went out a little ahead of me. I did not move from the corner described until Meyers came and took me by the arm and led me from the room. I did not know who it was, and asked, 'Who is that?' He answered, 'It is me, Dave; come on.' We went out at the door. I fell over something in getting out of the room, not very far from the door. Don't know what it was. I did not fall, but stumbled. I lost my slipper, but did not stop to get it. After leaving the room we went to Clara's room and called her, and from there to the front gallery, which was wet. Meyers pulled one of his shoes off and gave it to me. We staid there long enough to get the shoe on. I don't remember what was said on the gallery. I asked Meyers to take me away, as I was afraid to stay, and he said we would go to town and get the sheriff. We then went to Mr. Mayberry's livery stable, and from there to the sheriff. On this trip Meyers had one shoe on and one shoe off. Before the shooting I had been in my room with Clara and Meyers for three or four minutes. Meyers had been in my room sometime before I came. Clara had been in my room during the time Meyers and I were there. I talked to Meyers and Clara about getting the men out. Meyers said they ought to go, so we could close the house. He made some remark to me about getting the men out, closing the house, and going to bed with him. I told him I could not go to bed before I got the men out. I then went back into the sitting room alone, leaving Meyers in my room. I talked to Jones and Binkley about half an hour, trying to get them to leave the house. They said they would not leave until daylight, and wanted to see some one put them out. They made these statements in a loud and angry tone. They could have been heard anywhere in the house, as the partitions are thin, and could have been heard further, as an ordinary conversation could be heard on the outside, and this was louder than an ordinary conversation. I then left the sitting room and went back to my room, where I found Clara and Meyers. Meyers was sitting on

the edge of the bed undressed when I went in. I told them that I could not get the men out, and did not know what to do. While I was standing there Meyers started to put on his pants. I stood there just a minute or two, when I went back into the sitting room, Meyers following right behind me. This is the time the shooting occurred. Meyers stood in the center of the room talking to Binkley, and asked him three or four times to go, but Binkley said he would not go until daylight. Meyers was a little nearer Binkley when these remarks were made than when the shooting took place. The shooting took place about a minute after these remarks of Meyers and Binkley. Everything seemed quiet except the conversation between Jones and I."

Cross-examination: "The conversation of Binkley and Jones during the evening had been sneering and insulting. Meyers asked Binkley in a gentlemanly way to leave, but was answered in a sneering and insulting way that he would like to see some one try to put him out. Can't say that Binkley put his hand behind him when he rocked forward in his chair, as I did not look. Don't think he got out of his chair after Meyers came into the room. Meyers and I were insisting on Binkley and Jones leaving the house, but they were holding the house by force and against my will. Meyers was there with my consent and approbation. After the other crowd had left Binkley and Jones remained, against my importunities to leave, for some half or three-quarters of an hour before Meyers came into the room where they were. Mayberry, at the time the other crowd left, tried to get Binkley to leave. I told them I had no conveniences, and they could not stay. I think Mr. Mayberry came with them. Mayberry tried to get them to leave, but they would not do so. From the time of the first shot I saw no other light in the house until I went back with Mr. Gambill. I remained in the room until Meyers left, and came out with him. I was in possession of the house. It was my home."

Redirect: "Meyers made no attempt at any time to put Binkley and Jones out of the house. When I say they held the house by force, I mean they took possession and declined to leave. I mean by, 'they took possession,' that they would not leave the house. I had been living in this house since the Monday before. It is a public place. I am the proprietor of the place. The public generally had my permission to visit and frequent the house, but I had said nothing to the public about it. People had been frequenting my house during the time I was there. About ten or eleven would be there every night. I gave the people generally that came there an invitation to come back. I did not invite Binkley to return, as I had had a quarrel with him. I did not invite Jones to return, although I had had no quarrel with him. Meyers was not there at this time. I mean by conveniences for Binkley and Jones that I had no bed for them to sleep on.

Miss Clara had a bed, but she was going to occupy it herself, and I had no control of her room."

Recross: "I asked Binkley to stay away from the place the first time he came, as I thought they were crooks, and was afraid for them to stay."

Redirect: "Meyers was not present when I requested them to stay away, and don't think I told him of it. I mean by crooks, people who steal. I thought they were thieves. I was facing Jones at the time of the shooting and nearly facing Binkley. I was talking to Jones. If Binkley had gotten up and pulled out a pistol and presented it, perhaps I would have seen it. If he had gotten up or moved to another chair I would have probably seen him, but if he had moved in his chair I would not have necessarily seen him. If he had gotten up out of his chair, I would have seen him. If he had presented a pistol while sitting down, don't know that I would have seen it, but guess I would. I did not see Meyers sit down after he went into the room. Don't know whether he sat down or not. Don't know whether I sat down or not, but don't think I did. The sitting room is about fourteen feet square."

Clara Watson, a witness for the State, being duly sworn, testified as follows: "On the night of the 14th of this month I was at the Blue Goose, of which Emma Carlton is the proprietor. It is sometimes called the Blue House. I heard shooting there that night, about 2 o'clock in the morning. About four or five shots were fired. I did not count them. I was in Emma's room at the time. The shooting was in the parlor. Emma and Dave Meyers were in the parlor at the time of the shooting. They had been in Emma's room before the shooting. It was about twenty-five minutes after they left Emma's room that the shooting took place. I heard no conversation between Meyers and Emma in her room. Emma spoke to me about getting the men to leave. Don't think Meyers could have heard it. I never heard any conversation between Meyers and Emma. I heard Emma tell Meyers that she could not go to bed until the men left. She then went into the parlor. When I came into Emma's room Meyers was putting on his coat. I did not hear any of the remarks made in the sitting room."

John H. Bickett, a witness for the State, being duly sworn, testified as follows: "I am sheriff of Milam County, Texas. I saw Dave Meyers on the night of the 14th of January at my gate, between 3 and 4 o'clock. Mr. Mayberry knocked at my door and stated that Mr. Meyers wanted to see me at my gate. I got up, put on my clothes, and found Mr. Meyers there. He said he had a little trouble at the Blue Goose, and wanted me to go and see about it. Don't remember whether he told me voluntarily or whether I asked him where it was. Don't remember his exact language, but understood him to mean that

he wanted to surrender. He offered to let me ride in the buggy, but, noticing that the shoe was off of one foot, I told him to get back. He stated that if he went back there he wanted some protection. I told him that I did not think it necessary for him to go, and that I would leave him at the sheriff's office and I would go myself. He and the woman came down to the sheriff's office in a buggy and Mayberry and I walked. I then left Mr. Mayberry, Meyers, and the woman at the court house steps. Went to the jail, woke up Mr. Gambill and Mr. Birdsong, and then told Meyers to stay in my office with Mr. Birdsong. Mr. Gambill and I went down to the Blue Goose and found a dead man lying in one of the first rooms on the right as you enter the house. He was lying on his back, on the right side of the door, with his head near the carpet strip and his feet pointing towards the southeast corner of the house. I found a wound near the lower edge of his pocket on his left leg, which looked much like a pistol wound. It looked like a couple of gallons of blood had been spilled. I saw no other wounds. I found a woman's slipper near the elbow of the left arm. A person leaving the room would have to step over the body. Did not find any arms of any kind on the dead body. Found a pistol ball hole in the north wall that the door was in, which went straight through the wall. There was another one through the east partition wall, about two feet high, which went through in a northeast direction and struck about three feet from the wall. I think Giles Averitt found this last bullet. Meyers gave me a pistol in the sheriff's office. It was a forty-five Colt's revolver, empty, and seemed that all the chambers were freshly discharged. This all happened in the State of Texas, county of Milam, and city of Cameron. I had seen Binkley twice on the street, but did not know his name. I recognized him as the man I had seen on the street. We got to this house about 4 o'clock in the morning."

Cross-examination: "The six bullets I here present were said to have been found about the house. I think I picked one up myself; one was handed to me by Justice English as the one cut from Binkley's leg. I don't remember who picked up the second ball that was found in the hall. It was handed to me by some one. Several were present. Giles Averitt picked up one in the east room, as before stated. The fifth bullet was handed to me by D. B. Worcester, who said Mr. Webster handed it to him. The sixth ball was handed to me by some one, I can't remember who. It was said to have been picked up in the northeast corner of the room where the shooting occurred. The first came into my possession early in the morning, and it was late in the evening when the last one was handed me. The balls looked to me like they would fit a number 45 Colt's pistol."

Dr. W. W. Greer, being duly sworn, testified as follows: "I did not know W. A. Binkley. On Sunday morning last I went to the house

called the Blue Goose, and found there the body of a dead man. He was wounded in the left thigh, about four inches below the joint. The ball entered in the front of the thigh, ranged upward, and striking the bone, glanced around it on the outside, and was cut out by me right under the trochanter major of the thigh bone. He was also shot through the right arm. It looked as though the ball entered above the elbow, came out, and entered again just above the elbow, breaking no bones, and came out on the under part of the arm below the elbow. When I saw the body it had been moved into another room. I saw a good deal of blood. I do not think the wound in the arm would have produced death. As to the wound in the thigh, I could not determine whether the femoral artery was cut or not, but there appeared to have been much bleeding. The ball entered and ranged within an inch and one-half of the femoral artery at the nearest point so far as I could trace it. I could not find that the artery was broken by the ball. It might have been ruptured, but I could not determine. The femoral artery at the groin is only covered by the skin and connective tissues, there being no muscles covering it at that point. There was no other wound at this place. A long pants pocket would be about over the place where this ball entered. I think this wound was of such a nature as would produce death. If the femoral artery was cut death would result in a few minutes, say five or eight. There are other large veins in the course of the range of the ball, which if cut would also produce death just as certainly, in say ten or fifteen minutes. I also found a cut, and around it a bruise, on the left cheek bone. The skin was broken up and down the face, and all around it the skin was bruised. The cut was three-pronged and irregular, and must have been made with some hard blunt substance or instrument. There was another cut in and in front of the left temple, about one inch long, and down to the bone. The effect of the shot which struck the thigh bone and broke off a piece of it would, if standing, cause the man to fall in a few seconds, and if sitting in a chair he would not be able to maintain his seat for any great length of time; just how long I could not say. It is possible for a man receiving such a wound to rise to his feet again after falling. It would depend upon the severity of the hemorrhage which might follow. Neither of the wounds on the face would be likely to produce death."

Cross-examination: "At the groin the femoral artery is near the surface. It passes on the inside of the thigh as it goes down. The artery at the knee is behind the leg at the joint. As it goes down it dips deeper under the muscles as it approaches the knee. Just opposite where the ball entered the artery was deeper under the tissues than at the groin. If death resulted from this wound hemorrhage was the immediate cause. If a man receives this shock while sitting in a rocking-chair and leans back, the shock would cause some muscular

action. Whether he would fall backward or forward would depend upon the muscular effort he made. If this shot was received in the act of rising from the chair or leaning forward, the man would have been most likely to fall forward. I saw the room where the body was found. There were some broken bottles, mostly on a table, but some pieces were on the floor in the blood."

Question: "Dr. Greer, could the wounds you saw on deceased's face and head have been produced by his falling on the floor and striking some hard substance?"

Answer: "I do not think they could have been produced that way, but I don't say it was impossible. If a hard substance came with the same force it would produce the same effect, and the appearance would be the same, whether the hard substance was the moving body or the man was the moving substance. Two bodies coming together would produce the same effect, and it could not be told from the wound which was the moving body."

Redirect examination: "If the femoral artery is cut, it would take about one-half gallon loss of blood to produce death in a man."

Recross-examination: "I did not in this case ascertain whether or not the femoral artery was cut. The same quantity of blood taken from any other place on the body would produce the same effect if taken away as rapidly."

E. F. Mayberry testified as follows: "I am in the livery business, and run a hack and transfer line. On Saturday night last I carried the man called Binkley and the man called Jones to the place called the Blue Goose. There was at the place when I was there about eight or ten men. Binkley for the first half hour was about as civil as the most of the crowd. Later on he became rather boisterous, having been drinking. He did not make any threats further than to swear he would stay all night. The women had told him that they could not accommodate him. He caught one of the girls and tried to take her out of the room, and some of the boys took him away from her, or helped to free her. He did not offer to do violence to any one in my presence. His demeanor was not insulting or overbearing to any one except the girls, and it was not so to them, except that when they asked him to leave he swore that he would not, and said that he would stay all night. When I got ready to leave I went to Emma Carlton's room and found Dave Meyers lying on the bed. I asked him if he was asleep. He raised his arm and I saw he was not asleep. I then got all the boys in the hack except Dave, Binkley, and Jones. Before starting Dave came out and told me that he wished I would try and get them fellows to go, meaning Binkley and Jones."

Cross-examination: "About half an hour after we got to the Blue Goose Binkley became boisterous and overbearing to the women. Jones and myself tried to get him to go home. He refused, and swore

that he was going to stay all night.   He did not say that no one could make him leave, while I was there.   When Jones caught hold of him to make him go he tore loose, saying that he could take care of himself.   When told that there was no bed he swore that he would stay all night.   He asked what a quilt would cost, and said that he would sleep on the damned floor."

Recross-examination:   "When I was at the Blue Goose, it was very dark and raining.   When Meyers came to my stable I asked him if there had been any trouble down there.   He stated that there had. He stated that he wanted a buggy to go to Mr. Bickett and get him to go down and see what had happened, as it was so dark he could not see the extent of it.   And I asked him if he had to do any shooting, and he said he had to do some shooting."

Question:   "Did Meyers state to you the effect of the shooting, or any part of it?"

Answer:   "He did, but I do not recollect his exact language; but it was to the effect that one man was killed, or down."

Charley Coleman, being duly sworn, testified as follows:   "I was at the house known as the Blue Goose on Saturday night.   Was there between 12 and 2 o'clock.   I saw a man there they called Binkley. There was a good deal of drinking in the crowd, and Binkley seemed to be drinking.   He used no personal insulting language to any one. He indulged in a good deal of laughing and talking.   He used some overbearing language, but to no certain one.   Seemed to be a boisterous kind of talk.   I mean by boisterous that he used hard words towards the crowd generally.   He was cursing.   I don't know exactly what he said.   I did not hear any conversation between Meyers and the hackman when we left."

Cross-examination:   "I heard Emma Carlton ask Binkley to leave the house, but he stated he would stay if he had to sleep on the floor. Binkley's conduct was boisterous and insulting, but was addressed to the crowd generally and no one particularly."

No briefs have come to the hands of the Reporter.

SIMKINS, JUDGE.—1. We do not think that the court erred in refusing bail in this case.

2. On the habeas corpus trial relator objected to the evidence of A. H. Jones, deceased, taken at the inquest held over W. A. Binkley, deceased, on the ground that relator was forced, over his protest and that of his counsel, to be present at said inquest, and that he refused to take any part therein.

The district judge overruled the objection and admitted the testimony.

The record shows, that on the 14th day of January, 1894, relator killed W. A. Binkley and mortally wounded A. H. Jones, who died the next morning. In holding the inquest over the body of Binkley A. H. Jones was examined as a witness, and relator was required by the justice of the peace to be present; and he was present in person and by counsel during said examination, and the said A. H. Jones was the only witness examined; that relator and his counsel objected to being present, and although offered the privilege of cross-examining the witness, refused so to do. Relator was brought to the inquest from jail, where he was confined under charge of the murder of W. A. Binkley, deceased.

Article 999 of the Code of Criminal Procedure declares, that should the justice deem proper the inquest may be held in private, but in all cases where a person has been arrested, charged with having caused the death of the deceased, such person and his counsel shall have the right to be present at the inquest and to examine witnesses and introduce evidence. Evidently it was the object of the code to limit the power of the justice as to holding private inquests, and to give a person, when arrested for murder, the *right* to be present and defend himself and change the proceeding into an examining court. It does not follow that the person accused can not be compelled by the justice to attend the inquest where he is under arrest and a necessity exists therefore, nor that the justice may not hold an examining court while holding an inquest. Code Crim. Proc., art. 1011. The witness was dying. The necessities of the case probably required prompt action in obtaining the evidence, and it seems wholly immaterial whether the justice styled the proceeding an inquest or examining trial. The relator was charged with the murder; he was confronted with said witness; he was present, though unwillingly, and was represented by able counsel; the privilege of cross-examining the witness was offered to him and refused. The relator does not show a deprivation of a single right. The code, under these facts, places the deposition of a witness on the same plane, whether taken before examining court or inquest. Article 774 of the Code of Criminal Procedure declares, that where defendant is present when the testimony is taken and had the privilege of cross-examining the witness, the deposition taken before an examining court or inquest, and reduced to writing and certified according to law, is admissible. The evidence is clearly admissible.

3. Relator objects further, that the court erred in admitting the dying declarations of A. H. Jones, because no sufficient predicate had been laid to admit the same. The witness English, called to prove the dying declarations of Jones, states that he went to see Jones between 3 and 4 o'clock in the morning of the 14th of January. "When I went in I found Dr. Greer there. When I first went to his bed he spoke to me, calling me 'Doctor.' I told him I was justice of the peace, and

had come to see him to ascertain how badly he was hurt and to learn the particulars. He seemed to be suffering very much, and I asked the doctor if he was seriously hurt, and he said he thought so. I also asked him if there was any hope of his recovery; and he said he could not tell; that he might get well. Jones spoke up and said, 'Doctor, don't try to fool me; I know I am bound to die.' Then he asked the doctor how long he could live, shot as he was, and the doctor repeated he might possibly get well, and Jones insisted he knew he was bound to die. Then appellant made a statement of the difficulty in which Binkley was killed and himself wounded. Some five or ten minutes after the statement was made Jones said he had hopes he might recover." It is settled, that unless at the time of making the declarations the declarant was conscious of approaching death, and believed there was no hope of recovery, they are not admissible. The certainty of impending death is the equivalent of the sanctity of an oath, and the declarations are not admissible *if made while any hope of recovery remains.* As presented by the record, it is certainly questionable whether the declarations are admissible. While it clearly appears that *before* the declarations were made he was fully impressed with the belief that he was bound to die, and desired to know how long he could live with such a wound, yet the subsequent expression of hope of recovery, following at so short an interval after the declarations were made, raises a doubt as to the absence of all hope at and during the time when they were made.

The record is silent as to any cause for the change or when it took place, or as to the time elapsing between his first statement and last, or what was said to him calling forth such an expression. On the trial of the case the facts and circumstances surrounding Jones, and his own conduct at the time, before, and after making the declarations, may be more clearly shown, and the court below may more intelligently pass upon the case than can be now done.

                                                      *Affirmed.*

Judges all present and concurring.