### Carl Craven v. The State.

#### No. 3275.   Decided December 6, 1905.

**1.—Murder—Dying Declaration—Rule of Evidence—Predicate.**

In order to authorize the introduction of evidence of dying declarations, it is incumbent on the State to prove; that the deceased when he made it was conscious of approaching death and believed there was no hope of his recovery; that the declaration was voluntarily made, and not through the persuasion of any person; that it was not made in answer to interrogatories calculated to lead deceased to make any particular statement; and that deceased was of sane mind at the time of making the declaration.

**2.—Same—Case Stated—Predicate not Sufficient.**

On a trial for murder, it was error to introduce the dying declaration of deceased upon the predicate that deceased said, "I believe I am fatally shot," which statement was made about 11 o'clock at night, and the purported dying declaration was made the following day at about 5 o'clock in the evening; the

evidence further showing that only two hours before deceased made said state-
ment he expressed a doubt as to whether he was mortally wounded. Following:
Ledbetter v. State, 23 Texas Crim. App., 247; Ex parte Meyers, 33 Texas Crim.
Rep., 204.

**3.—Same—Evidence—Character of Dying Declaration.**

Dying declarations can only be admissible where the death of the deceased
is the subject of the charge, and the circumstances of the death are the subject
of the dying declaration, and it was error of the court on a trial for murder to
admit statements as dying declarations having no reference to the death and its
cause of deceased.

**4.—Same—Evidence—Res Gestae—Declarations of Defendant.**

On a trial for murder, it was error to exclude the statement of defendant to
his father made within four or six minutes after the homicide, and in which
statement he gave an account of the difficulty. Such testimony under the facts
of this case was also admissible to corroborate defendant, his testimony having
been attacked as varying with that made by him on the witness stand.

Appeal from the District Court of Kaufman. Tried below before
Hon. J. E. Dillard.

Appeal from a conviction of murder in second degree; penalty, five
years imprisonment in the penitentiary.

The dying declarations of deceased gave the following account of the
homicide: "Deceased told me [witness] that he got in the wagon with
defendant at the store and started off down the road, said he was going
to Pyles Prairie to pick cotton, and that they had gone some distance
and defendant said to him: 'Ed, we have not been getting along very
well of late, and it looks like we ought to try to do better and come
to some better understanding and get along better.' Deceased said,
'Yes, I think so, we have not been getting along well, I think we ought
to try to arrange matters and settle this thing and get along.' That
they talked the matter over and the deceased said to the defendant: 'I
have not anything against you at all, Carl, not anything.' He says, 'If
you get sick and need any help, need my assistance, I am willing to do
anything I can for you.' Deceased said they settled the thing and
they went on down the road together, and got down to the corner of
Buchanan pasture, turned west where there was a mail box. Defend-
ant asked deceased to get out and look in the mail box, that he was
looking for a letter, or a note there for some party, he agreed to leave
him a letter that day, and that he was feeling very bad and sick and
did not feel like getting out; and that deceased got out and went to the
mail box when defendant began shooting."

One of the State's witnesses, among other things, testified to the
homicide as follows: "The first I saw was the defendant standing in
his wagon, facing eastwards with his pistol in his hand pointing east-
ward, and I heard the report of a pistol and then the next I saw was
deceased, he looked like to me, he was either running or backing. There
was a mail box there nearby  *  *  *  .  The wagon was stopped and
defendant was standing in the wagon  *  *  *  .  I looked from the
deceased back to defendant and when I looked back to deceased I did
not see him any more, I suppose he had fallen; and then I looked at

defendant and he had jumped out of the wagon and ran back a piece, it must have been half way to the gate   *   *   *   .   He ran east and stopped and fired two shots; I heard three shots fired in all   *   *   *   . He han back to the wagon, got into it and drove off in a gallop."

The evidence is very voluminous, showing that defendant and deceased were brothers-in-law; that they had some litigation between them and bitter feeling resulted.   Defendant testified of some previous difficulty between him and deceased, and the wife of deceased testified to threats of violence and language indicating that deceased was likely to attack defendant.   Defendant claimed that he acted in self-defense in the difficulty with deceased who was the superior in strength.   The above statement with that contained in the opinion elucidates the points at issue.

*Young Adams,* for appellant.—On question of dying declaration:   10 Am. and Eng. Enc. Law, 364; State v. Partlow, 4 S. W. Rep., 14; Meyer v. State, 86 Am. State Rep., 634, and notes.   On question of declaration of defendant as res gestæ:   Craig v. State, 30 Texas Crim. App., 619; Scott v. State, 10 Texas Ct. Rep., 928; Freeman v. State, 40 Texas Crim. Rep., 545.

*Howard Martin,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was charged by indictment with killing Ed Keith, was convicted of murder in the second degree, and his punishment fixed at five years confinement in the penitentiary.

During the trial the dying declaration of Keith was admitted as evidence.   Several objections were urged.   The court heard the testimony of Mrs. George Peede, Dock Phillips, Dock Hudson and Chip Reasonover, wherein the State was attempting to lay the predicate for the introduction of the dying declarations.   On exception being taken, the testimony was excluded.   Subsequently, in a second attempt to introduce the dying declaration, Tom Demasters was used as a witness. On this statement of Demasters, the dying declaration was admitted, to wit:   Keath turned over and made this statement, "I believe I am fatally shot."   The conversations occurring between the witnesses, except Demasters, was some hours prior to deceased's statement to Tom Demasters.   The purported dying declaration was made the following day, at about 5 o'clock in the evening.   The statement to Demasters was made about 11 o'clock at night prior to said dying declaration. The time intervening being from 11 o'clock at night, until 5 o'clock the next evening.   The contention here is made that the proper predicate was not laid.   In order to authorize the introduction in evidence of the dying declaration it is incumbent on the State to prove (1) that the deceased when he made it, was conscious of approaching death, and believed there was no hope of his recovery; (2) that the declaration

was voluntarily made, and not through the persuasion of any person; (3) that it was not made in answer to interrogatories calculated to lead deceased to make any particular statement; and (4) that deceased was of sane mind at the time of making the declaration. The only evidence that was introduced as a means of justifying the introduction of the statement of deceased was through Tom Demasters to wit: "I believe I am fatally shot." This did not exclude the hope of recovery; nor does it show that he was conscious of approaching death, in the sense in which this statute means approaching death. Of course every man knows, as a matter of fact, that ultimately he must die, and the fact that he may state a belief of the fact, does not show, within the meaning of our statute with reference to dying declarations, a consciousness of approaching death. The predicate must exclude hope of life. It must reach the point of a certainty in the mind of declarant that all hope of recovery is gone, and that he is conscious of then approaching death, and in his mind it must be the inevitable result. Of course, the fact is in the record that deceased was dangerously shot, but he had stated to the physician and others who endeavored to have him make a statement, that he had some hope of recovery. Ledbetter v. State, 23 Texas Crim. App., 247; Ex parte Meyers, 33 Texas Crim. Rep., 204; 10 Amer. & Eng. Ency. of Law, 2nd ed., p. 364, et seq. Page 366 of the cited volume contains this language: "To render such declarations admissible, the declarant must not only believe that he is about to die, but he must be without hope." Further, "According to the clear preponderance of authority, if the deceased had the slightest hope of recovery when the declarations were made, they were inadmissible." The words of our statute, "lost all hope of recovery," means that it is a belief in death which does exclude any hope of recovery. The rule may be summed up, as found on page 368, of the same work, "That the belief declarant may ultimately die from his injuries is not sufficient." 41 Texas, 496. And it it has been held in Hunnicutt's case, 18 Texas Crim. App., 498, that the declarant must be in extremis, and under the solemn conviction that he is bound to die, and that all hope of recovery is eliminated from his mind. Only two hours before deceased in this case should have made the statement to Tom Demasters, one of the doctors told him that he thought he was bound to die, and the other asked him if he realized how mortally wounded he was. Studying over the question a moment, deceased replied, "I do not know that I do." The doctors continuously held out to him encouragement during their treatment of him. We therefore hold, under this record that which purports to be the dying declaration was inadmissible. For a case strongly in point see Ledbetter v. State, supra. All of the authorities, so far as we are aware in our State, construe our statute to the same effect.

Again, exception was reserved to some of the statements of the deceased as not being dying declarations, even if the predicate had been laid. We believe this contention is correct. Even had the proper

predicate been laid, all these statements not with reference to the death and cause of death, should have been excluded. With reference to this particular question the rule has been long as we understand thoroughly settled, that dying declarations can only be admissible, "where the death of the deceased is the subject of the charge, and the circumstances of the death are the subject of the dying declarations." There are some further exceptions in regard to the impeachment of the dying declaration, and the failure of the charge to limit the introduction and rejection of other testimony, which we deem unnecessary to discuss, as the dying declaration under the predicate was not admissible. Therefore, the other questions pass out, as they are but corollaries to the main proposition.

Shortly after the difficulty, and within four to six minutes, appellant made a statement to his father, which was excluded. He reached his father's front gate, from four to six minutes after the shooting. His horses were running almost at break-neck speed, appellant was greatly excited, and was immediately asked by his father what was the matter. The reply was that he had trouble with Ed Keith, and that Ed Keith had struck him, and threw a rock at him, and tried to pull him out of his wagon, and that he (Keith) was going to kill him, and that he had to shoot him. We think this testimony was admissible. Craig v. State, 30 Texas Crim. App., 619; Scott v. State, 10 Texas Ct. Rep., 928; Freeman v. State, 40 Texas Crim. Rep., 545, and collated authorities. This was res gestæ under the authorities of our State, and under the circumstances it was proper to have admitted it. It would have also been admissible under another theory, as corroborative of appellant's statement on the stand as a witness, he having been impeached by statements at variance with his statement on the stand. The statement to his father was practically the same as that of his testimony on the trial. However, we are of opinion that it was admissible as res gestæ, and therefore original testimony.

For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*