## O. J. JOHNSON v. THE STATE.

### No. 5637.     Decided January 28, 1920.

**1.—Murder—Evidence—Declaration of Deceased—Predicate—Res Gestae.**

Upon trial of murder, where the evidence showed that the next morning after the difficulty an officer had a conversation with the deceased. in which he informed him that he had arrested the right man, it was error to admit in evidence the declaration of deceased that he was glad that the officers had got the right man; it being neither a dying declaration nor *res gestae*, even if a proper predicate had been laid. Following: Craven v. State, 49 Texas Crim. Rep., 81, and other cases.

**2.—Same—Dying Declaration—Charge of Court—Rule Stated—Predicate.**

The testimony of a physician that he informed deceased, prior to making the statement that he was glad that the officers had the right man, that his wound was a serious one and he thought a fatal one, this was not a sufficient predicate for dying declaration; besides, where the predicate is of a doubtful nature the court should instruct the jury under what circumstances they could consider such declaration, and when they could not.

**3.—Same—Evidence—Acts and Declarations of Officers—Opinion of Witness.**

Where, upon trial of murder, the evidence showed that the officers arrested three persons including the defendant shortly after the homicide, and that thereafter they discharged the two others, testimony why they did so and their reasons therefor should not have been admitted, as this was simply the opinion of the officers.

**4.—Same—Charge of Court—Self-Defense.**

Where, upon trial of murder, the evidence showed that deceased was killed while defendant was in the act of chasing a woman trying to recover money which she had taken from him, deceased interfering when the fatal shot was fired either by defendant or someone else, the court in his

charge on self-defense, under article 1105, subdivision 8 of the penal code, should have applied the law to the facts of the case and it was reversible error to refuse a requested charge on this phase of the case.

**5.—Same—Evidence—Res Gestae—Exculpatory Statement.**

Upon trial of murder, there was no error in admitting the declarations of deceased within five minutes of the shooting that another person not the defendant had shot him, as this was a *res gestae* statement and it devolved upon the State to disprove that statement and to show that the defendant fired the fatal shot.

**6.—Same—Jury and Jury Law—Special Venire—Statutes Construed.**

Where, upon trial of murder, it appeared from the record on appeal, that in drawing the special venire the names of one hundred and forty-four jurors summoned for regular jury service during the term were placed in the box, and one hundred and fifty names of the jurors who had been drawn for special venire service were also placed in the box, and out of the two hundred and ninety-four names of jurors contained in the box, seventy-five names were ordered to be drawn as a special venire to serve in the instant case, the same was reversible error, as the names of the regular jurors should first have been econmized as required by the statute before the special venire list wat used, and the question of injury does not enter in this case. Following: Moore v. State, 49 Texas Crim. Rep., 629; Distinguishing: Taylor v. State, recently decided.

Appeal from the District Court of San Augustine. Tried below before the Hon. Garland Smith, special judge.

Appeal from a conviction of murder; penalty, death.

The opinion states the case.

*Wm. McDonald, E. T. Anderson, D. M. Short & Sons,* for appellant.—On question of special venire: Gabler v. State, 49 Texas Crim. Rep.; 623; Mays v. State, 50 id., 165; Saye v. State, 50 id., 569; Keith v. State, 50 id., 63; Brown v. State, 54 id., 121; Porter v. State, 215 S. W. Rep., 201; Oates v. State, 48 Texas Crim. Rep., 131; Moore v. State, 49 id., 629; Bishop v. State, 81 Texas Crim. Rep., 96, 194 S. W. Rep., 389; Mickle v. State, 213 S. W. Rep., 665.

On question of dying declaration: Sorrell v. State, 74 Texas Crim. Rep., 505; Lockhart v. State, 53 id., 589; Bateson v. State, 46 id., 34.

*Alvin M. Owsley,* Assistant Attorney General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted and given the death penalty under charge of the murder of J. B. Yarborough.

The killing occurred in Sabine County. On charge of venue the case was tried in San Augustine County. It is disclosed by the testimony that Yarborough was in charge of a turpentine camp where there were three white men employed and one hundred or more negroes. Appellant had been working at this camp about

four years. His wife was cooking for Yarborough at the time of the homicide, though temporarily absent on a brief visit to her daughter. On the night of and prior to the homicide appellant had been at the house of John Bostick, who was living with a woman by the name of Nelly Baldwin. Their relations seem to have been of an illicit nature. Bostick is known throughout the record under the nickname of "*It.*" While at Bostick's or "It's" house appellant had been treating the crowd present to moonshine whiskey, and exhibited money while doing so. He and the woman left Bostick's house, and directly she returned and went through the house, closely followed by appellant. Almost immediately after the two passed through the house they were heard quarreling a short distance away. This was about ten o'clock at night. Appellant was chasing her to recover from or make her give him the remainder of the money that she had stolen from him. The evidence indicates that she had returned some of it, and he was claiming that she still had three ten dollar bills. He told her that she must return the money or he purposed killing her. At this juncture Mr. Yarborough appeared upon the scene armed with a shotgun. He demanded to know the cause of the trouble, and was informed by appellant that the woman had taken his money and if she did not return it he was going to kill her, having his pistol in his hand. A brief conversation occurred and Yarborough said he would make the woman turn over the money, and demanded that appellant hand him the pistol, and reached for it. The pistol was discharged, the ball entered Yarborough's right side about the tenth rib, passing out a little higher on the opposite side. Deceased's right hand is shown to have been powder-burned. Within five minutes a white witness reached Mr. Yarborough's residence, found him shot, and Yarborough made the statement to him that "Old It shot me." This was the negro named John Bostick. "It" or John Bostick and Nelly Baldwin were arrested, taken to the commissary and handcuffed. Later some negroes brought a pistol to one of the white men. Whatever information was conveyed to him was followed by the officer arresting the defendant and discharging from custody Bostick and Nelly Baldwin. The testimony shows that the pistol handed the officer showed one cartridge discharged, and was about a 44-calibre. The officer, on reaching appellant's residence, found him on the inside with the door locked, which he entered. Appellant was sitting on or standing by the bed, and his gun and pistol were on the bed. These were taken and appellant arrested and carried about ten miles to the county seat, Hemphill. The next morning after the officer returning he called upon Mr. Yarborough, and had a conversation with him. The details of this conversation are not given, but it seems to have been rather an extended one. In this conversation the officer informed Yarborough that he had "arrested the right man." This statement of the officer was excluded

by the court, and the jury instructed to disregard it, but the witness was permitted to testify that Yarborough stated he was glad they had got the right man. Objection was also urged to this, and overruled.

We are of opinion this testimony should have been excluded. It was not a dying declaration, nor was it *res gestae.* If it be granted that the circumstances were sufficient to lay the predicate for dying declarations, this statement of deceased, that he was glad they got the right man, would not be a dying declaration. We are of opinion, however, that under the cases of Craven v. State, 49 Texas Crim. Rep., 81 and Phillips v. State, 50 Texas Crim. Rep., 129, a proper predicate had not been laid. In that conversation there seems to have been no predicate laid. However, Dr. Cousins testified he had informed deceased prior to making this statement that his wound was a ''serious one'' and ''he thought fatal.'' If this was all the predicate laid, under the authorities above cited it would not be sufficient, and the testimony should not have gone to the jury for want of a proper predicate. While in this connection, it may also be stated that where the predicate is of a doubtful nature, the court should instruct the jury under what circumstances they could consider such declaration, and under what circimstances they should not. Wherever there is doubt as to the dying declaration, that involves a doubt as to the law and the facts, the jury should be left untrameled to decide whether a proper predicate had been laid, and instructed if they do not so find they should not consider it. Upon another trial the above charge should ge given if the testimony be admitted.

There is also an exception reserved which we think should have been sustained in regard to the reasons given by the officer why he discharged Bostick and Nelly Baldwin. These were matters with which the defendant had no concern, and the reasons operating upon the mind of the officer were impressions he received from hearsay statements that he received from others. These matters were not admissible against appellant. It was but the officer's opinion that he had made a wrong arrest of those two parties and a correct arrest as to appellant. This was a serious issue in the case and one of the controlling questions. This was but the officer's opinion and not the facts. Whether Bostick or appellant shot Yarborough was a serious question. If when Yarborough came upon the scene where appellant, if it was appellant, and Nelly Baldwin were, and they were quarreling, he was within a few feet of the man who fired the shot. He was sufficiently close to show that his hand was powder-burned. Under these conditions in five minutes he made the statement that it was ''It'' or Bostick who killed him. He did not mention or indicate that appellant was present or had anything to do with it. The evidence also shows that the pistol obtained by the officer had one cartridge discharged.

This was furnished him before he went to appellant's house and made the arrest. When he arrested appellant he found appellant's pistol on the bed, and the pistol was not the same one, for he obtained the first pistol before he went to appellant's house. As we gather from this record there was no attempt to show appellant had two pistols. If Bostick killed Yarborough, appellant should have been acquitted. These matters are mentioned incidentally, bebause the issue was sharply contested that appellant did the killing; that Bostick may have done so. It seems that Yarborough had theretofore intervened between Bostick and Nelly Baldwin in their quarrels. This brings also the question of charges.

Appellant claimed under the law of self-defense on the facts as made by the State, that he would have had the right to kill Nelly Baldwin, she having stolen his money at night from him and would not return it. He is justified in this conclusion under the terms of Article 1105, subdivision 8 of the Penal Code. If appellant was the party who did the killing, and was chasing this woman who was charged with taking his money, he would be justified in his action in trying to recover it, even to the extent of shooting the woman under the terms of the article above cited. The facts make it evident that he had nothing against Mr. Yarborough; and it is also made evident by the testimony that appellant had always sustained a good reputation the four years he had been working at this turpentine camp. If Yarborough interfered under those circumstances, while appellant's mind was agitated by reason of the above circumstances, and he was trying to recover his money, and appellant believed that Yarborough was interfering to prevent his recovery of the money, and that he either shot at the woman and killed Yarborough, or shot Yarborough himself, the case, as it occurs to us, would not be one of murder. The court recognized this and charged the jury that if he killed in defense of his property, he would not be guilty of a higher offense than manslaughter. There is no testimony in the case that shows he had any antipathy to Mr. Yarborough, and whatever is involved in the case for the State in its strongest light occurred immediately in connection with the shooting. The evidence excludes the idea that there was any other reason or circumstance that pointed to why Yarborough was killed, if appellant shot him. The court's charge was rather limited, and should have been broader in favor of appellant upon this proposition. He was not trying to defend his property, but he was chasing the woman and trying to recover his money after she had stolen it. This called for a full charge, under the terms of the statute above designated, in favor of appellant in trying to recover his money from the woman, Baldwin. If deceased interfered under those circumstances and tried to prevent, or appellant believed he was doing, his recovery of the money from the woman, he could not be guilty of a higher offense

than manslaughter. There is a total absence of any ill-will or malice towards Yarborough on the part of defendant, unless it arose at the time and under the circumstances already detailed. As before stated, the court should also have submitted for the jury's consideration, that "It" or Bostick may have shot the deceased. The deceased knew them well. They had been hands on his place and under his supervision for some years, and while it was at night, yet they were only a few feet apart, and his statement that it was Bostick or "It" who shot him, was put in evidence by the State, which excluded the idea of appellant being guilty of firing the shot and fastened it upon John Bostick alias "It." Defendant asked special charges seeking to submit the above in accord with the law. These were refused.

There is a question also raised as to the admissibility of the statement of deceased to the officer within five minutes of the shooting that it was "old It who shot him." We believe, as the record is presented, this was a *res gestae* statement, and that the court did not err in admitting it. This would devolve upon the State the burden of disproving that statement.

A bill of exceptions was reserved to the action of the court overruling the motion to quash the special venire. The facts were admitted, and a brief statement is only necessary. In drawing the venire the 144 jurors summoned for jury service during the term were placed in the box. The jury commissioners had also drawn 150 names for special venire service. They were also placed in the box at the same time, the total number of names of jurors contained in the box being 294. Out of this number seventy-five were ordered by the court to be drawn, selected, summoned and served upon defendant as the special venire to serve in his case. The facts were also admitted to be true in this connection that this was the only special venire case for that term of court, and that none of the jurors for the different weeks of the term of court had been drawn on any special venire, therefore they were not excluded from service under any of the terms of Article 661, Vernon's Ann. C. C. P., p. 356. That article provides:

"Whenever the names of the persons selected by the jury commissioners to do jury service for the term shall have been drawn one time to answer summons to a *venire facias,* then the names of the persons selected by the said commissioners, and which form the special venire list, shall be placed upon tickets of similar size and color of paper, and the tickets placed in a box and well shaken up; and, from this box, the clerk, in the presence of the judge, in open court, shall draw the number of names required for further venire service, and shall prepare a list of such names, in the order in which they are drawn from the box, and attach such list to the writ, and deliver the same to the sheriff; and it shall furthermore be the

duty of the clerk, and he shall prevent the name of any person from appearing more than twice on all of such lists.''

This Act provides for drawing venires in regard to petit jurors drawn for service during the term. The only change as to former laws is that it requires the jury commissioners to draw what is termed in the Act a special venire list. This is an additional list of names to serve on special venires exclusively, and these cannot be called into service until the jurors summoned for regular service have been economized under the terms of the Act. When this has been done the clerk shall then resort to special venire jurors and the list selected specially for that purpose. In other words, the purpose of the Act is to require the exhaustion of the petit jurors before resorting to these specially drawn for special venire service, and for the further purpose of using those jurors so specially drawn as talesmen. Moore v. State, 49 Texas Crim. Rep., 629. This in no way conflicts with the recent case of Elbert Taylor v. State. It is unnecessary to go into the question, or discuss it in any phase as to the attitude the case would have been in had the jurors for the term been exhausted and talesmen were called. This did not occur. So the question narrows itself sharply as to whether or not, under the circumstances depicted in the bill of exceptions, and admitted to be true, the court erred in not quashing this list, and whether he erred in the manner of selecting the special venire. As we understand the terms of this statute, the jurors selected for jury service during the term must first be economized and used as required by the statute. Until this has been done the list of jurors drawn for the special venire list are not authorized to be placed in the jury box and drawn to serve on special venires. This question was decided in Moore v. State, *supra*. There were 144 jurors drawn for jury service. These should have been placed in a box and a venire of seventy-five names drawn without resorting to those drawn for the special venire list by the jury commissioners. This was not done; but instead, not only the 144 names were placed in the box, but the 150 drawn by the jury commissioners for special jury service were also placed in the box, and the seventy-five drawn from it in approximately equal numbers as to those on the special venire list and those on the jury service list for the week. This was not authorized by the statute, and the jury was not selected in accordance with law, but in violation of its terms. A jury trial and the manner of enforcing such trial is strictly guarded by the statute. The Legislature having provided this means for obtaining a jury, the court was not at liberty to set it aside. The question of injury does not enter into the case. Appellant was insisting upon the legal rights he had for the selection of a jury, and he is entitled to that character of jury trial provided by law. The selection of a jury, of course, underlies the fact that he has a proper jury.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*