MRS. PEARL NEWSOME v. THE STATE.

· No. 6785.  Decided March 14, 1923.

**1.—Murder—Manslaughter—Evidence—Declaration of Conspirator.**

On trial of murder and a conviction of manslaughter, there was no error in admitting in evidence the declarations of a conspirator made to the deceased and his companions. Following Richards v. State, 53 Texas Crim. Rep., 400, and other cases.

**2.—Same—Evidence—Declarations of Third Parties—Hearsay.**

Upon trial of murder and conviction of manslaughter, the declarations of third parties after the homicide to defendant's co-conspirator with reference to a certain automobile, should not have been admitted in evidence.

**3.—Same—Evidence—Declarations of Defendant—Res Gestae.**

Where, upon a trial of murder and a conviction of manslaughter, defendant claimed that she went to the rescue of her son, who was attacked

by the deceased and a companion, her declarations to her husband when he arrived at the scene of the difficulty that there were four men on her son beating him, and that they had him down and were killing him, when she ran out of the house to his defense, should have been admitted in evidence as res gestae, as they were uttered but a few moments after the shooting.

#### 4.—Same—Evidence—Res Gestae—Declarations of Third Parties.

Upon trial of murder and a conviction of manslaughter, the declarations of a third party who was a companion of the deceased at the time of the killing, to the effect that the defendant came to the rescue of her son and shot deceased, should have been admitted in evidence. Following Burnet v. State, 12 Texas Crim. Rep., 536, and other cases.

#### 5.—Same—Charge of Court—Practice on Appeal.

Where the Court submitted the issues of murder, manslaughter, self-defense, defense of another, and provoking the difficulty, in a proper manner, there was no error, the conviction being sustained by the evidence.

Appeal from the District Court of Wood. Tried below before the Honorable J. R. Warren.

Appeal from a conviction of manslaughter; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*M. Reynolds & M. D. Carlock,* for the defendant.—On question of res gestae: Craven v. State, 49 Texas Crim. Rep., 78; Douglas v. State, 54 id., 639; Humphrey v. State, 55 id., 329; Pratt v. State, 50 id., 227; Jennings v. State, 42 id., 81.

*W. A. Keeling,* Attorney General, and *C. L. Stone,* Assistant Attorney General, for the State.—On question of declarations of third parties: Russel v. State, 11 Tex. Crim. 295; Uppon v. State, 48 Texas Crim. Rep., 294; Eggleston, 59 Texas Crim. Rep., 642, 128 S. W. Rep., 1111.

On question of declaration of defendant's husband: Rainer v. State, 67 Texas Crim. Rep., 87, 148 S. W. Rep., 735; Porterfield v. State 64 Texas Crim. Rep., 179, 141 id., 968; Bronson v. State, 59 Texas Crim. Rep., 17, 127 id., 177.

MORROW, Presiding Judge.—Appellant was indicted for murder; but convicted of manslaughter; punishment fixed at confinement in the penitentiary for a period of two years.

The appellant, with her husband and children, resided at their home, which was situated some four hundred yards distant from the house occupied by one, Mrs. Holter. The reputation and conduct of Mrs. Holter led the appellant to believe that she was a prostitute and that she was plying her vocation at the place mentioned. She (appellant) had requested officers to cause the removal of Mrs. Holter, and according to her testimony, she had been authorized by the sheriff to secure evidence upon which Mrs. Holter might be convicted. This authority was controverted by the State's witnesses. On the night

on which the homicide occurred, she became aware of the fact that four men had gone to the premises occupied by Mrs. Holter, and she and her son, a youth about sixteen years of ago, armed themselves and went to the premises. While there appellant shot two of the young men and there were circumstances suggesting that her son stabbed one of them.

According to the son, deceased and his companions assaulted him, and in the struggle his shotgun fired. He called to his mother, was struck and felled to the ground, where he remained until after Milam was killed and Carlyle wounded.

There was testimony that at the time appellant entered the house, she was about twenty feet from her son and the deceased and his companions. There was also evidence that sometime before the homicide, she had expressed the purpose of preventing men from visiting the premises of Mrs. Holter, even if she had to kill them. She and her son and her husband saw the deceased and his three companions at the time they were about to pass through the premises of the appellant, and she knew that they were forbidden by either her husband or her son to do so; also that her son had afterwards gone to the premises and returned to his home, reporting that the young men had gone to the Holter place; that she knew that they had left their automobile near her own dwelling. She and her son armed themselves and went to the Holter house. According to the State's theory, when they reached the house, the son said: "You go in the house, mamma; I have got these," and immediately presented his gun and commanded the deceased and his companions to remain quiet.

The circumstances warranted the court in receiving in evidence the declarations of Paul Newsome made to the deceased and his companions. These declarations were admissible because the evidence was such as justified the jury in the inference that she heard and saw enough of the words and acts of her son to give her knowledge that his conduct was hostile to deceased and unlawful. The declarations were also properly received on the theory that the appellant and her son were in agreement and acting together in the unlawful enterprise which resulted in the homicide. The declarations of Paul Newsome in the absence of appellant were not admissible to prove the conspiracy, but there was sufficient evidence before the jury to prove the conspiracy and render the acts and declarations of the co-conspirators binding on each other. Richards v. State, 53 Texas Crim. Rep., 400; Hays v. State, 90 Texas Crim. Rep., 195; Wharton's Crim. Ev., Vol. 2, Sec. 888; Underhill on Crim. Ev., Sec. 491-492.

Appellant, in her testimony, denied the threats imputed to her, and both she and Paul Newsome disclaimed any intent to commit the homicide. Paul's testimony controverts that of the State's witnesses concerning the aggressive acts on his part; and the appellant denies any knowledge of them or any hostile words on the part of Paul towards

the deceased or his companions. She claimed that she had been deputized by the sheriff to obtain facts which would sustain a prosecution against Mrs. Holter, and that her purpose in going was to obtain such evidence; that she was afraid to go unarmed or alone; that the parties were drinking and on reaching the premises, she called Mrs. Holter four or five times; that a little girl opened the door and she went in the house, and was told that her mother (Mrs. Holter) could not see the appellant. She did talk to her, however, and Mrs. Holter expressed her gratification that she had come, and requested that she remain until she could get "shed" of the boys; that while there she heard a gun fire and heard her son holler for help; that she ran to the door and found her son on the ground with four men on him; over and around him; and that one of them was using a gun on him; that observing the situation, she began shooting.

It appears that the State witness Kalb testified that during the shooting, he and Debenport ran away a short distance—from twenty to fifty feet; that he dropped the gun and went back as quick as he could; that he then ran to his car, which was about four hundred yards distant; that he was much excited; that he ran a little bit and stopped a little bit; and after he had gone about one hundred and fifty yards, he met Hiram Newsome coming from his home and going towards the place of the difficulty; that Newsome asked him what was the matter. Newsome testified that when he heard the shooting, he went from his house directly to the place of the difficulty; that about half way between the two houses, he met Kalb and Debenport; that he at the time was running and they were walking pretty fast; that after meeting them he proceeded to the house, where he found his wife standing in the road, crying and wringing her hands. The appellant offered to prove that at the time he met Kalb and Debenport, that in response to Newsome's inquiry as to what was the matter, Kalb said that he and his companions had undertaken to take the gun away from Paul Newsome; that in the scuffle the gun went off; that they knocked Paul down and that he hollered for his mother for help; that Milam and Carlyle were on him and that she ran out of the house and shot and killed Milam and wounded Carlyle.

After the homicide Kalb and Debenport went to their automobile and undertook to start it for the purpose of going after a doctor. They were unable to start it. They met Paul Newsome near his home and a conversation took place betweem them, according to Kalb. In the conversation the witness told Newsome that he wanted to go for a doctor but that the car would not start. Newsome asked to whom the car belonged. Kalb replied that it was his car, and Newsome said: "Then I will start it for you." They went to the car and Newsome raised the hood or did something to the car which caused it to start. These declarations were received over the objection of the appellant that they were hearsay.

Appellant also undertook to prove by the witness Hiram Newsome that upon his arrival at the scene of the difficulty, in response to his inquiry concerning the disturbance, his wife said that there were four men on Paul, beating him; that they had him down and were killing him, as she thought, when she ran out of the house; after hearing Paul call for help, she went to him and found him on the ground and one of the men had a shotgun and the others were beating him; that he was lying with his face down and then shot. This testimony was also excluded.

Appellant insists that both the excluded declarations were res gestae and that those admitted were not admissible. As to the declaration of the appellant imputed to her by her husband, the contention of the appellant is sound. But a few moments had elapsed between the time of the shooting and her purported declaration to her husband. He had but time to go at a rapid gait some four hundred yards from his house to that at which the homicide took place. The deceased and his wounded companion were still on the ground where they had been shot down, and their associates, Kalb and Debenport, were but a short distance away. The appellant was excited and agitated over the tragedy. The immediate connection between the tragedy and the declarations, and the absence of any intervening fact characterize her declarations made at that time as res gestae. This view is fully sustained by the following cases: Craig v. State, 30 Texas Crim. App., 81; Craven v. State, 49 Texas Crim. Rep., 78; Douglass v. State, 54 Texas Crim. Rep., 639; Garcia v. State, 156 S. W. Rep., 942; Casey v. State, 51 Texas Crim. Rep., 435; Humphrey v. State, 55 Texas Crim. Rep., 329. The res gestae declaration of the appellant in the instant case was consistent with her testimony and that of her son.

Kalb testified for the State that while the appellant was in the Holter house, Paul Newsome presented his gun and demanded of the deceased and his companions that they come not another step. Kalb said:

"I was just a little behind Debenport, . . . and as he (Paul) turned the gun, I grabbed it and brought it up . . . and the gun went off, and the boy right then hollered, 'Mama,' and I snatched the gun away from him and Carlyle and John Milam grabbed him. Mrs. Newsome came out then, and . . . the boy had jerked loose then, or something, and Mrs. Newsome came out running; she was about eight feet from us before I saw her, and when she come up with the gun she come up shooting. She shot John Milam first, shooting him in the back; she shot him twice. She shot three times, and the third time she shot Guy Carlyle."

This puts a different color on the status of the difficulty from that described in the res gestae statement in question, and the latter is in harmony with the testimony of the appellant given on the trial court; also that of her son. The principle that res gestae statements of one

accused of crime are admissible in his favor has often been upheld and applied in this State. See Burnet v. State, 12 Texas Crim. App., 536, and other cases listed by Mr. Branch in his Ann. Tex. P. C.; Sec. 86. The exclusion of them is not justified because there is other testimony describing the occurrence in the same manner as it is described in the res gestae. Neyland v. State, 13 Texas Crim. App., 550; Griffin v. State, 40 Texas Crim. Rep., 515; Harrison v. State, 20 Texas Crim. App., 399. Whether the exclusion of the testimony of Hiram Newsome relating to the declaration which he imputed to the witness Kalb is within the res gestae rule is a matter of more difficulty.

Kalb and Debenport were in a sense participants. Kalb, according to his testimony, took the gun away from Paul Newsome, and Carlyle and Milam seized him, and during the struggle, the fatal shots were fired. This was the standpoint of the State. From the appellant's standpoint, not only the deceased and Carlyle were assailants of Paul Newsome at the time the shots were fired, but Kalb and Debenport were also attacking him. The res gestae rule, as defined by the decisions of this court, is not materially variant from that given by the text writers. Powers v. State, 23 Texas Crim. App., 42; Wallace v. State, 82 Texas Crim. Rep., 588; Vernon's Texas Crim. Stat., Vol. 2. p. 608, note 40. In its application, the courts of this State have extended the rule beyond the scope given it in most jurisdictions. Lewis v. State, 29 Texas Crim. App., 202; Wharton's Crim. Ev., Vol. 1, Sec. 262, note..

Treating Kalb as an actor in the tragedy, his declarations, as detailed by Hiram Newsome, apparently come within the res gestae rule as illustrated by precedents. See Woods v. State, 87 Texas Crim. Rep., 354; Henderson v. State, 89 Texas Crim. Rep., 21, 229 S. W. Rep., 540; Taylor v. State, 89 Texas Crim. Rep., 112, 229 S. W. Rep., 552.

Concerning the purported acts and declarations of Paul Newsome in regard to the automobile we are of the opinion that their receipt was not proper. They were not descriptive or explanatory of the immediate incidents of the tragedy and therefore are not within the res gestae rule. They were subsequent to the homicide and not within the scope of the rule admitting the declarations of a co-conspirator See Cox v. State, 8 Texas Crim. App., 254; Branch's Ann. Tex. P. C., Sec. 695, and cases listed. The excluded res gestae evidence to which we have adverted was material in support of the theory that the shots were fired by appellant in defense of her son, under circumstances which viewed from her standpoint at the time, rendered her conduct necessary. The refusal to receive this testimony was an error calculated to prejudice the appellant's case.

The issues of murder, manslaughter, self-defense, including defenses of another, and provoking the difficulty, were submitted to the jury in a charge which, in our opinion, is subject to none of the criticisms made by appellant.

The errors pointed out are such as require a reversal of the judgment. It is so ordered.

*Reversed and remanded.*